IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| GLENN MABSON and OZELLA SCOTT` MABSON, | ) ) ) | CV. NO. 06-00235 DAE-LEK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ASSOCIATION OF APARTMENT OWNERS OF MAUI KAMAOLE, JEFF MARSH, Resident Manager, DESTINATION MAUI, NANCY PRICE, Property Manager, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFFS' EX PARTE MOTION FOR
ENLARGEMENT OF TIME TO FILE OPPOSITION AS MOOT; AND
ORDERING PLAINTIFFS' COUNSEL TO SUBMIT FURTHER ARGUMENT
TO SHOW CAUSE AS TO WHY THE COURT SHOULD NOT IMPOSE A
RULE 11 SANCTION TO PAY FOR HALF OF DEFENDANTS'
<u>REASONABLE ATTORNEYS' FEES</u>

On August 13, 2007, the Court heard Defendants Association of

Apartment Owners of Maui Kamaole ("Association"), Jeff Marsh ("Marsh"),

Destination Maui, and Nancy Price's ("Price") (collectively, "Defendants") Motion

for Summary Judgment.[1]   Andre Wooten, Esq., appeared at the hearing on behalf

_____

[1]      On July 28, 2007, Plaintiffs filed an Ex Parte Motion For Enlargement
(continued...)

of Plaintiffs Glenn Mabson ("Glenn") and Ozella Scott Mabson ("Ozella"); Lynne

T. Toyofuku, Esq., and William N. Ota, Esq., appeared at the hearing on behalf of

Defendants.  After reviewing the motion and the supporting and opposing

memoranda, the Court GRANTS Defendants' Motion and DENIES Plaintiffs' Ex

Parte Motion as moot.

Additionally, upon further consideration, the Court hereby ORDERS

Plaintiffs' counsel to supply the Court within 10 days of the date of the filing of

this Order with further explanation concerning the reasonableness and the

competency of the inquiry that Plaintiffs' counsel undertook to determine the

validity of the claims contained in the instant Complaint.  Defendants then shall

have 10 days to respond.  Based on the arguments contained in the additional

memoranda (as well as those made at the hearing), the Court shall make a finding

concerning the frivolity of the instant Complaint for the purpose of a Rule 11

sanction.  If the Court determines that the instant Complaint is frivolous and, thus,

a proper basis for a Rule 11 sanction, the Court shall impose sanctions on

Plaintiffs' attorney, Andre S. Wooten, to pay half of Defendants' reasonable

---

[1](...continued)
of Time to File Plaintiffs' Concise Memorandum Opposing Defendants' Summary
Judgment Motion ("Ex Parte Motion").  For the reasons stated herein, the Court
denies the Ex Parte Motion as moot.

attorneys' fees and other expenses as a direct result of the costs incurred in

defending this lawsuit, pursuant to Fed. R. Civ. P. 11(c)(1)(B) and 11(c)(2).

## BACKGROUND

Glenn is an African-American male with an alleged history of

epilepsy.  (Glenn's Declaration ¶ 5.)  Because of his claimed epilepsy, Glenn

started a business with his mother, Ozella, called the Epileptic Foundation of Maui

("EFM"), of which Glenn is the CEO and Ozella is the founder.  (Defendants' Ex.

A (Glenn Deposition, Vol. I), at 76.)  Glenn also receives social security benefits,

possibly due to his epilepsy.  (Pls' Ex. 16.)  Ozella is an 84-year old, African-

American woman who allegedly has "bad knees" and high blood pressure, the

latter of which is medically documented.  (Pls' Ex. 20; Ozella's Declaration ¶ 3.)

Plaintiffs claim that Ozella's "medical condition," which condition is not entirely

clear, led to a heart attack and stroke.  (Ozella's Decl. ¶ 2.)

The Association is an organization consisting of owners of the

two-story residential condominium known as Maui Kamaole ("condominium").

Destination Maui is a property management company that serves as the

condominium's managing agent.  During the relevant times in question, Marsh was

the on-site manager at the condominium, and Price served as the property manager.

Plaintiffs rent condominium unit I-205 from Leo and Beverly Nikora, who are not parties to this lawsuit.

On July 24, 2006, Plaintiffs filed an Amended Complaint, alleging violations of (1) the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq.,[2] (2) Hawaii Revised Statutes ("Haw. Rev. Stat.") §§ 368 and 515, (3) Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. §§ 12101 et seq. and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2000), and (4) intentional infliction of emotional distress ("IIED").  Plaintiffs also bring a cause of action for "punitive damages," though punitive damages are a remedy for relief, not a separate cause of action.  Plaintiffs claim that Defendants refusal to assign them a free, handicap parking space at the condominium in addition to their assigned parking space  and, neglectfully, to trim the landscaping in front of their unit amounts to discrimination and harassment based on disability and race.

Plaintiffs live on the second floor of the condominium in a two-bedroom unit.  Despite Ozella's "bad knees," Ozella occupies the upstairs

_____

[2]      Plaintiffs incorrectly cite violations of the FHA as 42 U.S.C. §§ 3200-3220 in the first cause of action.  Plaintiffs' second cause of action cites the correct statute under which the Court shall review Plaintiffs' FHA claims.  Plaintiffs' third cause of action is identical to the second of cause of action under the FHA.  Accordingly, the Court shall construe Plaintiffs' first through third causes of action as one cause of action pursuant to the FHA.

bedroom because of the open loft, which, she claims, would place Glenn at risk. (Ozella's Decl. ¶ 5.)  If Glenn were to sleep in the upper bedroom and have a seizure, Ozella states that he could fall over the wall or out of the window.  (Id.) That arrangement requires Ozella to walk up two flights of stairs to reach her bedroom.  (Id. at 109.)  The condominium does not have an elevator that goes from the first floor to the second floor of the building. (Id.)  Yet, knowing that, Plaintiffs rented the second floor unit, residing there since 2001, even though they claim that they have difficulty walking and climbing stairs.  (Id.)  Glenn claims that the walk is "very therapeutic" for Ozella, and Ozella agrees.  (Id.; Ozella's Decl. ¶ 6.) Plaintiffs are happy with their living situation, and they do not intend to move.

Each condominium "has the exclusive use of (1) one parking space[.]" (Plaintiffs' Ex. 3.)  The "free" use of a second parking space is available for a second car during the first twenty-four hours that the vehicle is on the property, otherwise a visitor/renter/owner must purchase a parking pass that remains in effect for six additional days.  (Id.)  After that, the visitor/renter/owner may purchase other passes, including monthly passes, or, if over two months, may participate in an annual parking stall lottery to obtain an additional space.  (Id.) Plaintiffs have one assigned parking stall (parking stall #36), which is the closest stall to their unit.  Plaintiffs park one car in that stall, and they park a second car in

5

an unassigned handicap stall (parking stall #28), which is further away from their

unit.  (Defs' Ex. B (Glenn's Deposition, Vol. 2) at 34-35.)

Ozella primarily parks in the handicapped stall, even though it is

further away from Plaintiffs' unit than the assigned stall, because she has a Maui

County Handicapped Parking placard, which remains in effect until February 2008.

(Pls. Ex. 21.; Ozella's Decl. ¶ 7.)  Glenn admitted that he did not have such a

placard because "[t]here's only one handicapped person [that is, Ozella]."  (Defs.

Ex. B. at 73.)  Glenn further stated, "I mean [] I was handicapped at one time and

we interchanged.  I didn't go down and apply for a handicapped parking sticker

myself, I don't recall.  But she was the primary purpose of the handicapped stall.

That was for her basically."  (Id.)  The only reason that Glenn provided for not

parking his car in a non-handicapped stall, which would give Ozella (the only

admittedly disabled individual) the assigned stall closest to the unit, was that he

would be "charged for it."  (Id.)  At no time did a doctor(s) recommend or advise

Plaintiffs to have two cars because of problems with their legs and/or knees.  (Id. at

55.)

Glen operates his business, EFM, out of the condominium unit, even

though the lease provides that I-205 "shall be used and occupied . . . exclusively as

a private single family residence, and neither the pr[e]mises nor any part thereof

6

shall be used at any time . . . for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family residence.  (Defs' Ex. D, at ¶ 4 & Defs' Ex. E.)  Glen contends that he and his mother require the use of two cars, in part, because of his work for EFM, which requires him to drive a lot, and because his mother has a vehicle, which she drives as much as he does.  (Defs.' Ex. B at 55.)  Glenn works approximately 60-70 hours a week.  His various claimed injuries sustained as a result of Defendants' actions have not affected Glenn's ability to work those hours.  (Defs.' Ex. A at 85.)

Plaintiffs contend that the Association allowed them to use the handicapped parking stall until 2004, when the Association enacted a new set of parking rules.  (Defs' Ex. B., at 69.)  Plaintiffs are not aware of anything that would preclude the Association from enacting a new set of rules regarding parking. (Id.)  On May 17, 2004, the Association, noting Marsh as the resident manager, sent Glenn written notice, serving as the first warning, to inform him that he was in violation of Association House Rule No. VII.A.B. for the parking stall violation. (Pls' Ex. 3.)  On November 2, 2004, Marsh sent the following letter:

> First, because the I building handicapped parking stall is
> in the [Association] visitor's stall it can be moved easily
> to another visitor's stall.  This means that an
> [Association] visitor's stall closer to your unit can be
> assigned as handicapped parking.

7

> Secondly, any [Association] stall which constitutes a
> parking stall for an owner's/tenant's second car is subject
> to a $5.00/day or $30.00/week rental fee.  The maximum
> amount of time you being able to rent a stall for a second
> car is two months.  Looking long term, you can ask your
> landlords to enter the parking stall lottery on your behalf,
> which would allow for the long-term rentals of an
> Association stall for $360.00/year.  It is a random
> drawing and there are no guarantees that once you
> acquired a stall for a year that you would be able to retain
> it.
>
> In your current situation, with two vehicles, you are
> entitled to park one car in your assigned stall, and the
> second in an [Association] stall (visitor's or handicapped)
> and pay for its use.  The most cost effective solution is to
> eliminate one car from the property and park the single
> remaining car in your assigned stall.  This also happens
> to be the closest available stall to your unit.  Should you
> choose to occupy the single [Association] handicapped
> stall, I-205's deeded stall would then become a visitor's
> stall subject to the Owner's approval.

(Defs' Ex. F.)

On November 9, 2004, Marsh sent Glenn a second letter, again

highlighting the options available to him and indicating that the Association had

not heard from Plaintiffs.  (Defs' Ex. G.)  That letter further provided that Plaintiffs

would be expected to pay the associated fees for the second parking stall as of

November 15, 2004.  If Plaintiffs chose not to pay, the owners would be billed for

the second parking stall.  Finally, the letter noted that, as of January 15, 2005 (i.e.,

the end of the two month maximum non-lottery parking period), Plaintiffs would be required to remove one of their vehicles from the property unless they were able to obtain written permission from another owner of a unit to use a stall or they were to obtain a stall through the parking lottery.

On December 27, 2004, EFM informed the Association that both vehicles had valid handicap parking placards, when, in actuality, only one car had a placard (i.e., Ozella's car), which Glen drove at times.  (Defs's Ex. H.; Defs' Ex. B at 55.)

By January 15, 2005, Plaintiffs still had not removed their car from the handicapped parking space, causing Plaintiffs to accrue fees which subsequently were waived upon appeal.  (Defs' Ex. I.)

Yet another letter was sent on April 20, 2005, again emphasizing that the Association had not heard back from Plaintiffs about the proposed solutions to the parking dilemma.  (Defs. Ex. J.)  In the letter, Marsh pointed out that Glenn regularly drove without a handicapped parking placard, presumably parking in non-handicapped stalls around the island.  Marsh also noted the Association's willingness to work with Plaintiffs, stating "[i]f you feel that you require special accommodation, at [the condominium] due to the nature of your disability, I would request that you provide a letter with specific medical information to the

9

<u>Association as to how keeping two vehicles on [the] property [is] necessary to accommodate the disability</u>." (<u>Id.</u>) (emphasis added). That letter was met with no response.

A couple of weeks later, Price sent a letter to Glenn, reiterating Marsh's previous points and directing Plaintiffs to contact Marsh in five days to secure a second parking stall. (<u>Pls' Ex. 6.</u>) Glenn responded with a letter dated May 16, 2005, suggesting that Plaintiffs should be permitted to use the handicapped stall so that EFM could provide around-the-clock emergency responses, presumably with the second car. (<u>Pls' Ex. 7.</u>) EFM offered to treat a proposed waiver of the parking as an in-kind donation of up to $1,200.00 for state and federal tax purposes. (<u>Id.</u>) The Association declined the offer and again offered the lottery draw as a solution. (<u>Pls' Ex. 8.</u>) Plaintiffs took no action.

On August 18, 2005, Marsh sent Glenn a letter informing Plaintiffs that their parking pass had expired on August 11, 2005 and that they would have to make arrangements to park elsewhere, while again offering assistance in the matter. (<u>Defs' Ex. N.</u>)

As Plaintiffs did not heed any of those warnings and continued to park their car in the unassigned handicap space, on September 9, 2005, Marsh towed

Plaintiffs' unauthorized vehicle from the property.  (Defs.' Ex. O.)  The police

report reads

> As [the tow truck operator] was beginning to secure the
> vehicle to his rig, [Glenn] rushed out of his residence and
> jumped into the vehicle and tried to drive it off of the tow
> rig. [Glenn] then confronted [the tow truck operator] and
> pushed and shoved him several times trying to get him to
> release his vehicle.  The Resident Manager came out to
> inform [Glenn] of the parking violation.  [The tow truck
> operator] reported no injuries as a result of the above
> incident.  [Glenn] warned and reprimanded for his
> actions.

(Defs' Ex. O.)

On January 10, 2006, Plaintiffs filed a Charge of Real Property

Transaction Discrimination with the Hawaii Civil Rights Commission ("HCRC"),

alleging refusal of reasonable accommodations on the basis of race.  (Pls' Ex. 13;

Defs' Ex. S.)  The HCRC recommended that the case be closed based on "no

cause."  (Defs' Ex. Q.)

Plaintiffs subsequently filed the instant lawsuit, including allegations

of discrimination based on disability and race and harassment and discrimination

based on neglect to trim the landscaping (i.e., an overgrowth consisting of vines

hanging down in the entranceway) in front of their unit.  Concerning the

landscaping, the entranceway was shared with three other units.  (Defs' Ex. C

(Ozella's Deposition) at 67.)  Glenn complained to management about the overgrowth, after which maintenance trimmed the overgrowth, apparently without delay.  (Defs' Ex. B at 96; Defs' Ex. C at 67.)  Although Plaintiffs complain that the failure to trim the landscaping was discriminatory in nature, Ozella admitted during her deposition testimony that she "wouldn't use the word discriminat[ory]," rather she would classify the failure to maintain as "negligence of the maintenance."  (Defs' Ex. C at 118.)  Plaintiffs have not brought a negligence claim against management.

Plaintiffs also recalled racial slurs while at the pool/Jacuzzi area. (Defs' Ex. C at 60-61; Ozella's Decl. ¶¶ 31-33; Glenn's Decl. ¶¶ 29-20.)  Those slurs either were not directed at Plaintiffs or were made by a visitor to the pool area. (Id.)  For instance, while in the Jacuzzi, Ozella recalls a visitor asking her if she was the maid, which she did not report to management.  She also recalls an instance where her great-granddaughter and her great-granddaughter's friends were ordered out of the pool while visiting.  (Ozella's Decl. ¶ 32; Defs' Ex. C at 61.) Ozella was not present when the children were ordered out of the pool, as they reported back to her, and no reasons are provided concerning why the children were ordered out of the pool.  Another instance of allegedly discriminatory and harassing behavior affected the son of another resident, who allegedly was

12

"accosted at the pool by a man using a racial slur." (<u>Glenn's Decl</u>. ¶¶ 29-30.) The identity of the man is unknown, and there is no indication that that incident was reported to management. Furthermore, that alleged racial slur was not directed at either Glenn or Ozella.

Plaintiffs have not been treated for any psychological or psychiatric injuries resulting from Defendants' alleged conduct. (<u>Defs' Ex. A</u> at 14-15; <u>Defs' Ex. B</u> at 119; <u>Defs' Ex. C</u> at 116.)

On May 30, 2007, Defendants filed the instant Motion. On July 26, 2007, Plaintiffs timely filed their concise statement of material facts. Despite that timely filing, Plaintiffs filed their opposition two days late on July 28, 2007. That same day, Plaintiffs' attorney, Andre S. Wooten ("Wooten"), filed an Ex Parte Motion for enlargement of time to file the opposition. Wooten provided the following reasons for the late filing: (1) he suffered severe back pain stemming from an old injury for which he allegedly sought chiropractic treatment (without providing documentation of the treatment or indicating when he sought the treatment), (2) he had a flight to Wailuku for a trial on Friday, July 27, 2007 (the day after the opposition was due), (3) he had court hearings 4 out of the 5 days of that week (which he claimed was "normal but time-consuming"), and (4) he received notice of a settlement check on July 19, 2007 in a different case (well

before the opposition was due) for a client who had died.  As such, Wooten had to

conduct a mini-investigation to discover the client's next of kin.  Defendants filed

their Reply on August 2, 2007, arguing that Plaintiffs' opposition and supporting

documents should be stricken because of the late filing and the countless

procedural defects in Plaintiffs' concise statement of material facts, citing

Wooten's history of non-compliance with court rules.

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. California Dept. of Corrections</u>, 419 F.3d 885, 891

(9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).

A main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

14

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

judgment, the court shall have no independent duty to search and consider any part

of the court record not otherwise referenced in the separate concise statements of

the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine issue of material fact." <u>Addisu</u>, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  <u>Porter</u>, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  <u>Id.</u>  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

<u>DISCUSSION</u>

Plaintiffs seek declaratory and injunctive relief and compensatory and punitive damages for alleged violations committed pursuant to the FHA, Haw. Rev. Stat. §§ 368 and 515, and the ADA and § 504 of the Rehabilitation Act of 1973.  Plaintiffs also argue that they have sustained severe emotional distress as a result of the purported violations.  Defendants contend that Plaintiffs' allegations

fail as a matter of law.  The Court agrees with Defendants, finding that Plaintiffs'

legal contentions clearly are not warranted under existing law.

I.  Defendants' Motion for Summary Judgment

       A.  Claims Pursuant to the FHA

       Plaintiffs' FHA claims are based on Defendants' alleged failure to

make reasonable accommodations in connection with Plaintiffs' claimed

disabilities and race-based discrimination and harassment.

> To establish a discrimination claim for failure to provide
> a reasonable accommodation under the FHA[], a plaintiff
> must prove that "(1) [s]he suffers from a handicap as
> defined by the FHA[]; (2) defendants knew or reasonably
> should have known of the plaintiff's handicap; (3)
> accommodation of the handicap 'may be necessary' to
> afford plaintiff an equal opportunity to use and enjoy the
> dwelling; and (4) defendants refused to make such
> accommodation.

Lanier v. Ass'n of Apartment Owners of Villas of Kamali'i, CV No. 06-00558,

2007 WL 842069, at *5 (D. Haw. March 16, 2007) (quoting Giebeler v. M & B

Assocs., 343 F.3d 1143, 1147 (9th Cir. 2003)); see also 42 U.S.C. § 3604(f)(3)(B).

Here, there is a dispute as to whether Plaintiffs suffer from handicaps.  Although

Glenn allegedly suffers from epilepsy, Glenn admitted that there was only "one

handicapped person," meaning Ozella, and that he does not have a handicap

placard because Ozella was the "primary purpose [for having] the handicapped

stall." The record does not reflect any reason why Glenn would need the

handicapped stall for his epilepsy, other than for business purposes.

     As for Ozella, her high blood pressure is the only health condition that

is medically documented. Ozella claims that she has bad knees; yet, she still can

walk up two flights of stairs everyday without complaint. Moreover, Ozella

apparently enjoys the therapeutic nature of that walk. Recently, Ozella may have

suffered from a heart attack and stroke, both of which are undocumented. There is

no indication that her heart attack and stroke has contributed to her purported

"handicap." Despite the lack of clarity surrounding Ozella's handicap, Ozella does

have a handicapped parking placard.

     With that in mind, construing the evidence in the light most favorable

to Plaintiffs, the Court shall assume, for now, that Ozella is handicapped.

Notwithstanding that assumption, Plaintiffs have failed to set forth factual

allegations that would suggest that the <u>additional</u> parking spot, free of charge, is

necessary to afford Plaintiffs an equal opportunity to use and enjoy the

condominium. As the Court recently found, "[a] defendant's failure to waive

financial burdens, including generally applicable fees, can constitute discrimination

under the FHA[] in some circumstances." <u>Lanier</u>, 2007 WL 842069, at *5 (citing

<u>United States v. Cal. Mobile Home Park Mgmt. Co.</u>, 29 F.3d 1413, 1418 (9th Cir.

18

1994)).  To constitute discrimination, however, Plaintiffs must prove "that 'but for' the accommodation of waiving a generally applicable fee, 'they likely will be denied an equal opportunity to enjoy the housing of their choice.'" Id. (citing Giebeler, 343 F.3d at 1155).  Plaintiffs cannot, as a matter of law, meet that level of proof.

Plaintiffs have an assigned parking spot close to their unit (#36), which indisputably is the closest parking stall to their unit.  There is no indication in the record that but for Defendants' failure to waive parking fees for an additional space, Plaintiffs have been denied an equal opportunity to enjoy the housing of their choice.  See United States v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1380-81 (9th Cir. 1997) (determining that the plaintiff failed to show why a parking stall for the plaintiff's caregiver would have been necessary for the plaintiff's use and enjoyment of her home where there was no evidence to demonstrate why the caregiver could not have paid for guest and parking fees or parked her car elsewhere).  Ozella not only can park her car in the assigned space closest to her unit, but she does park her car there.  The record reflects that Glenn and Ozella share that space, and that Glenn, at times, uses the additional handicapped space for work-related purposes, not for Ozella's handicap.  In fact, Glenn's business appears to be the primary reason why Plaintiffs must have two

19

cars on the premises, as no doctors have recommended the use of two cars to support Ozella's apparent handicap.  Additionally, the only reason that Glenn provides for choosing not to park in a non-handicapped space is that he would be "charged for it."  The record does not reflect any reason why Plaintiffs cannot pay for an additional parking space (or park elsewhere) or why they should be given that special accommodation based on disability, on top of their existing authorized space, to afford them use and enjoyment of the condominium.  Thus, similar to the Ninth Circuit's determination in <u>Cal. Mobile Home Park Mgmt. Co.</u>, the Court finds that Plaintiffs have failed to introduce any evidence of an essential element to prove a claim under the FHA.

Even assuming that an additional, free parking space would afford Plaintiffs an equal opportunity to use and enjoy the dwelling, there is no evidence that Defendants refused to make such an accommodation.  In actuality, Defendants presented Plaintiffs with numerous options to obtain a second spot, and, had Plaintiffs provided medical documentation in writing explaining why they should be able to keep two vehicles on the property as a result of their disability, the Association would have been willing to provide Plaintiffs with special accommodations, according to the April 20, 2005 letter.

Before that April 20, 2005 letter, Marsh sent Plaintiffs multiple letters, suggesting that they enter the parking stall lottery to obtain use of an additional stall at the cost of $360.00 per year, receive written permission from another owner of a unit to use a stall, pay for the use of a handicapped stall or another stall as a short-term rental situation, or, worst case scenario, park the second car elsewhere. Glenn did not see the need to respond to any of the letters until he received a letter with the fees that Plaintiffs had accrued for use of the handicapped stall, which fees were waived upon appeal.

After further letters and an offer to provide special accommodations upon receipt of medical documentation, which never was provided, Glenn finally took action, offering to treat a waiver of the parking fees as an in-kind donation to EFM for tax purposes. Although that offer was rejected, the Association gave Plaintiffs another opportunity to remove their car or make other arrangements before towing it on September 9, 2005 (approximately 11 months after the first warning was issued). Notably, Glenn still had not accepted Defendants' offer for special accommodations upon receipt of medical documentation. Despite Glenn's alleged disabilities, when the tow truck arrived, Glenn was able to rush out of his residence, jump into the vehicle, and push and shove the tow truck operator. Not only does the record fail to support the necessity of an additional, free parking

21

space as a reasonable accommodation to which Plaintiffs are entitled based on disability, but the record reflects that Defendants, in fact, offered Plaintiffs numerous opportunities reasonably to accommodate them, all of which were ignored or disregarded.

Moreover, Plaintiffs present no factual allegations that would support a charge of racial discrimination and/or harassment under the FHA. The Court need not determine whether such claims may be brought pursuant to the FHA because Plaintiffs have pled no facts that would rise to the level of harassing or discriminatory behavior. Compare DiCenso v. Cisneros, 96 F.3d 1004, 1008-09 (7th Cir. 1996) (recognizing hostile housing/harassment claims under the FHA), with Lawrence v. Courtyards at Deerwood Ass'n, Inc., 318 F. Supp. 2d 1133, 1145-46 (S.D. Fla. 2004) (refusing to recognize, under the FHA, a cause of action for a hostile housing environment, as the Eleventh Circuit has not recognized such a claim). The only alleged claim of harassment or discrimination against Plaintiffs is the instance where a visitor allegedly called Ozella a maid. Neither management nor an employee made that statement, nor did Ozella report that statement to management.

The other instances of claimed harassment and/or discrimination allegedly were against Ozella's great-granddaughter and her friends and the son of

another resident.  Those claims do not support Plaintiffs' charge of discrimination

because they were not directed at Plaintiffs.  Moreover, there is <u>no</u> evidence that

Ozella's great-granddaughter and her friends were asked to leave the pool for a

discriminatory reason.  The Court does not care to speculate about the reasons why

management (if management actually is the alleged party at fault) asked the

children to leave, but merely recognizes that numerous non-discriminatory reasons

exist to explain why the children were asked to leave, such as bad behavior,

problems with the pool area, or reasons related to cleaning.

Because Plaintiffs have failed to make any factual allegations that, if

proven, would establish essential elements at trial, the Court GRANTS summary

judgment in favor of Defendants on all counts under the FHA.

B.  <u>Claims Pursuant to Haw. Rev. Stat. §§ 368 and 515</u>

Haw. Rev. Stat. §§ 368 <u>et al.</u> governs procedures to follow before the

Hawaii Civil Rights Commission for discriminatory practices, including

discrimination in housing.  Haw. Rev. Stat. § 515 <u>et al.</u> governs discriminatory

practices in real property transactions.  Similar to the "reasonable accommodation"

requirement under the FHA, Haw. Rev. Stat. § 515-3(11) provides for reasonable

accommodations when "necessary to afford a person with a disability equal

opportunity to use and enjoy a housing accommodation."  Because Plaintiffs'

23

allegations pursuant to Haw. Rev. Stat. §§ 368 and 515 are identical to those under

the FHA and rely on the same factual foundation, the Court GRANTS summary

judgment in favor of Defendants for claims brought pursuant to Haw. Rev. Stat. §§

368 and 515 for the same reasons.

C.  Claims Pursuant to ADA and Section 504 of the Rehabilitation Act
of 1973

Addressing the claims made under the ADA first, Title III of the ADA

prohibits discrimination by a private entity "on the basis of disability" when that

private entity owns, operates, or leases a place of "public accommodation."  See 42

U.S.C. § 12182(a); see also 28 C.F.R. § 36.201(a).  The key portion of the

provision, here, is "public accommodation."

Although Plaintiffs' disabilities are disputable, regardless of the

outcome of that dispute, the residential condominium here (and, in particular,

Plaintiffs' long-term rental unit within it) is not a place of "public accommodation"

within the definition of the ADA.  Included within the definition of "public

accommodation" under the ADA are lodgings such as hotels, motels, and inns, and

"other places of lodging."  42 U.S.C. § 12181(7).  Purely residential dwellings,

such as apartments and condominiums, are not included within the definition of

public accommodation under Title III of the ADA.  See also Indep. Hous. Servs. of

San Francisco v. Fillmore Ctr. Assocs., 840 F. Supp. 1328, 1344 n.14 (N.D. Cal. 1993) (finding that "the legislative history of the ADA clarifies that 'other place of lodging' does not include residential facilities" such as apartments and condominiums); Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 165 n.8 (3d Cir. 2006) (agreeing that "residential facilities such as apartments and condominiums are not transient lodging and, therefore, not subject to ADA compliance").  That there may be some short-term rental units within the condominium would not change that result.  Even for short-term rental situations, the owners still would have a choice as to whether or not to rent the unit and to whom to rent the unit.  See, e.g., Thompson v. Sand Cliffs Owners Ass'n, Inc., No. 3:96cv270/RV, 1998 WL 35177067, at *3 (N.D. Fla. March 30, 1998) (noting that even if an owner were to rent a unit, that owner "is still free to use his condominium at anytime, and he may also decide not to rent it out at all," and "when the units are not being rented, there is no question that they remain the owners' residences").  Additionally, the public would not be able to enter at their leisure as with facilities such as hotels, inns, and places of like temporary lodging, and the units still would maintain their residential character.

Although the Association, here, apparently granted Plaintiffs leeway to conduct their business in the rental unit, the unit's primary purpose and function

25

remained (and still remains) residential, as provided in the lease.  There may be times when an apartment building or condominium becomes public in character; for instance, when occupancy becomes available to any person for a limited portion of time without the need for a private, contractual lease arrangement.  From the record presented, that is not, however, the case here.  The Court, therefore, GRANTS summary judgment in favor of Defendants on Plaintiffs' claims made pursuant to the ADA.[3]

As for the claims made under Section 504 of the Rehabilitation Act of 1973, that Section provides:

> No otherwise qualified individual with a disability in the United States . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (2000).  Plaintiffs have presented no factual allegations that any Defendant is engaged in any program or activity that receives federal financial assistance or that an Executive agency conducts that has excluded Plaintiffs based

---

[3]     Even if the residential condominium could be classified as a public accommodation under Title III of the ADA, the Court finds that Plaintiffs have failed to set forth any factual allegations that would sustain a claim of discrimination based on disability.

26

on their disability.  Accordingly, the Court GRANTS summary judgment in favor of Defendants on claims brought pursuant to Section 504 of the Rehabilitation Act of 1973.

>           D.  IIED and Punitive Damages

Plaintiffs' IIED and punitive damages claims rest on Defendants' alleged failure to accommodate them and Defendants' alleged acts of discrimination and harassment.  Plaintiffs have failed to present any factual allegations that would support an IIED claim, Enoka v. AIG Haw. Ins. Co., 128 P.3d 850, 872 (Haw. 2006), or entitle them to punitive damages (or any other form of relief, Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535-36 (1999).  In short, Plaintiffs have alleged no facts that would support a claim that Defendants' acts were so intentional or reckless and extreme and unreasonable that they caused Plaintiffs' severe emotional distress.  Nor have Plaintiffs set forth any facts that would demonstrate that Defendants engaged in discriminatory acts with malice or reckless indifference to Plaintiffs' rights.  The Court, therefore, GRANTS summary judgment in favor of Defendants on Plaintiffs' IIED claim and claim for punitive damages.

II.  <u>Ex Parte Motion to Enlarge Time to File Opposition</u>

Wooten timely filed his Concise Counter-Statement of Facts

("CSOF"), but, for reasons that essentially amount to poor time management, he

filed his opposition late.  This is not the first time that Wooten has been warned for

procedural defects in his filings.  <u>See</u> <u>Epileptic Found. of Maui v. City and County</u>

<u>of Maui</u>, 300 F. Supp. 2d 1003, 1005 n. 3 (D. Haw. 2003) (noting in another case

involving the instant Plaintiffs that Wooten had filed an untimely opposition and

untimely declarations); <u>Shipley v. Hawaii</u>, Civil No. 05-00145, 2006 WL 2474059,

at *5 (D. Haw. August 24, 2006) (unpublished decision) ("As this court is so often

called upon to do, it again cautions [Wooten] for [the plaintiff] to file a timely

opposition, or statement of no opposition, to Defendants' motion for summary

judgment"); <u>Kaulia v. County of Maui</u>, Civil No. 05-00290, 2007 WL 2156091, at

*7 n.14 (D. Haw. July 20, 2007) (unpublished decision) (recognizing "the

numerous defects in [the plaintiff's] current pleadings" where Wooten was the

plaintiff's counsel).

Here, Wooten has failed to provide the Court with a satisfactory

reason for his delay in filing Plaintiffs' opposition, particularly given that Wooten

was able to file the CSOF in a timely manner.  Additionally, Wooten's CSOF is

not without fault.  Some of the defects include Wooten's failure to file a timely

Certificate of Service with his CSOF, filing it a day late, and, according to

Defendants, without actually delivering a hand-delivered copy as represented in the

Certificate.  Defendants state that they were not even aware that the CSOF had

been filed until it was entered on the Court's docket four days after it was due.  The

CSOF contains six pages, exceeding the five-page limit without a certification

indicating that Plaintiffs complied with the 1,500 word limit, pursuant to Local

Rules 7.5(e) and 56.1(d).  Defendants also raise concerns about the declarations,

arguing that they do not contain the language in 28 U.S.C. § 1746 ("the foregoing

is true and correct"), as well as the signatures, noting that Ozella's declaration does

not even include a signature and that Glenn's signature contained an electronic

"/s/" signature prohibited by § 5.3 of the General EFC Order.[4]  Because the Court

finds no merit to Plaintiffs' claims even considering Plaintiffs' opposition and the

supporting documentation, the Court DENIES Plaintiffs' Ex Parte Motion as moot

without striking the opposition and the supporting documentation as requested.

---

[4]      On August 3, 2007, Wooten filed a Notice of Filing Signature of
Glenn Mabson with Glenn's actual signature, apparently to correct the defect.  A
similar correction was not made for Ozella.  Additionally, on August 9, 2007,
Wooten filed an Errata to his opposition to add the Table of Contents and Table of
Authorities.

III.  Rule 11 Sanctions

          Notwithstanding the Court's leniency, the Court does not take these

violations lightly.  The Court is particularly concerned with Wooten's repeated

history of violations, which are well known in the Court, general lack of care and

attention to procedural matters and substantive details in the pleadings, failure to

deliver a timely Certificate of Service to Defendants (if one was delivered at all),

and the failure to obtain a signature for a crucial declaration.  Despite repeated

warnings, Wooten's continuous violations demonstrate, at best, neglect, and, at

worst, outright contempt for Court procedures and custom.  His representation as

counsel falls below the level of competence generally accorded practitioners with

his years of legal experience (over 20 years), which, given his history, could

expose him to disciplinary action under the Hawaii Rules of Professional Conduct.

          Along with exposure to possible disciplinary action, Plaintiffs'

non-meritorious claims expose Wooten to court sanctions under Fed. R. Civ. P.

11(c).  The Court does not, at this time, make any findings concerning an

"improper purpose" in filing the lawsuit, though such a finding could be inferred

from the legal and factual deficiency of the pleadings.  See Fed. R. Civ. P.

11(b)(1).  That said, the Court finds that Plaintiffs' legal contentions clearly were

not warranted by existing law, as they simply were based on an unwillingness to

30

pay for an additional parking spot and claims of harassment that did not even affect

Plaintiffs, except for one claim that did not even involve Defendants.  See Fed. R.

Civ. P. 11(b)(2); see also Holgate v. Baldwin, 425 F.3d 671, 676 (9th Cir. 2005).

Plaintiffs were not arguing that an additional parking space was necessary to

accommodate Glenn's disability, as Glenn readily admitted (and Plaintiffs' counsel

conceded) that he was not disabled.  They, furthermore, were not arguing that an

additional space was required so that Glenn could care for Ozella, which, even if

unsuccessful, at least may have been arguable.  Instead, Plaintiffs, in essence, were

arguing a back door attempt to get a free parking spot for Glenn to assist with his

daily activities and his business.

When asked during the hearing if Plaintiffs' counsel could justify

Plaintiffs' position, counsel responded that because Glenn previously was allowed

to use the handicapped parking spot, he should be allowed to continue that use,

even though, since then, Defendants have discovered that Glenn indisputably was

not, in fact, disabled.  Counsel conceded that point, yet he still advanced his

argument that, even if Plaintiffs received that parking spot through a prior

misrepresentation about Glenn's condition, Glenn (and/or Ozella) still should be

able to use that spot free of charge, apparently through the generosity of

management.  The Court simply cannot support an argument that one should be

31

able to continue to benefit from a prior "accommodation" (which term is used loosely) based on a misrepresentation that since has been clarified.  Moreover, as detailed herein, Plaintiffs have alleged no facts that reasonably may have supported their other claims.

The Court understands the limitations associated with the imposition of monetary sanctions on its own initiative.  See Fed. R. Civ. P. 11(c)(2)(A) and (B).  That is why, at the hearing, the Court provided Wooten with an opportunity to show cause as to why he should not be sanctioned pursuant to Fed. R. Civ. P. 11(c)(2)(B).  Wooten failed to provide the Court with any reason to dissuade it from issuing sanctions based on the frivolity of the claims pled.   The instant lawsuit not only was a waste of the Court's time and resources, but, more significantly, it was a waste of Defendants' time and resources when Defendants attempted to accommodate Plaintiffs' unreasonable request(s) without court involvement.  As the United States Supreme Court has acknowledged:

> Rule 11 requires that every paper filed with the District Court be signed by an attorney or by the party. The signature constitutes a certificate by the signer that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause

> unnecessary delay or needless increase in the cost of
> litigation."
>
> A pleading determined to be in contravention of the Rule
> subjects both the signer and the party he represents to "an
> appropriate sanction, which may include an order to pay
> to the other party or parties the amount of the reasonable
> expenses incurred because of the filing of the pleading,
> motion, or other paper, including a reasonable attorneys
> fee."

Willy v. Coastal Corp., 503 U.S. 131, 135 n.1 (1992).  A sanction against Wooten

to pay Defendants for the amount of the reasonable expenses incurred because of

the filing of the pleading, motion, and other papers, including half of Defendants'

reasonable attorneys' fees, therefore, would be appropriate under the

circumstances.

Notwithstanding the appropriateness of such sanctions, upon further

consideration, the Court recognizes that "[w]hen, as here, a 'complaint is the

primary focus of Rule 11 proceedings, a district court must conduct a two-prong

inquiry to determine (1) whether the complaint is legally or factually baseless from

an objective perspective, and (2) if the attorney has conducted a reasonable and

competent inquiry before signing and filing it.'" Holgate, 425 F.3d at 676 (quoting

Christian v. Mattel, Inc., 286 F.3d 1118, 1127 (9th Cir. 2002)).  The Ninth Circuit

defines the term "frivolous" to mean "'a filing that is both baseless and made

without a reasonable and competent inquiry.'"  Id. (Moore v. Keegan Mgmt. Co

(In re Keegan Mgmt. Co., Sec. Litig.), 78 F.3d 431, 434 (9th Cir. 1996)).  As for

the first prong, for the reasons stated herein and during the hearing, the Court has

determined that the Complaint is legally and factually baseless from an objective

perspective.  As for the second prong, Wooten alluded during the hearing that he

reviews inquiries before filing them.  Taking that statement at face value, the extent

of the reasonableness and the competency of the inquiry still is unclear.  Upon

further consideration, the Court determines that, at this time, it does not have

sufficient information at its disposal to make a definitive finding as to the second

prong to determine, conclusively, whether Plaintiffs' Complaint is "frivolous" for

the purpose of a Rule 11 sanction.  The Court has its leanings based on the

arguments propounded at the hearing and the underlying papers, but, in all fairness

to Plaintiffs' counsel, the Court shall provide Plaintiffs' counsel with an additional

10 days to supply the Court with further explanation concerning the reasonableness

and the competence of the inquiry that he undertook before filing the instant

Complaint.  Defendants then shall have 10 days to respond.  If Wooten fails to

prove to the Court that he conducted a reasonable and competent inquiry before

filing the instant Complaint, the Court shall, in line with Holgate, impose a Rule 11

sanction on Plaintiffs' counsel, Andre S. Wooten, to pay half of Defendants'

34

reasonable attorneys' fees and other expenses as a direct result of the costs incurred

in defending this lawsuit, pursuant to Fed. R. Civ. P. 11(c)(1)(B) and 11(c)(2).

CONCLUSION

       For the reasons stated above, the Court GRANTS Defendants' Motion

and DENIES Plaintiffs' Ex Parte Motion as moot.  Additionally, upon further

consideration, the Court hereby ORDERS Plaintiffs' counsel to supply the Court

within 10 days of the date of the filing of this Order with further explanation

concerning the reasonableness and the competency of the inquiry that Plaintiffs'

counsel undertook to determine the validity of the claims contained in the instant

Complaint.  Defendants then shall have 10 days to respond.  Based on the

arguments contained in the additional memoranda (as well as those made at the

hearing), the Court shall make a finding concerning the frivolity of the instant

Complaint for the purpose of a Rule 11 sanction.  If the Court determines that the

instant Complaint is frivolous and, thus, a proper basis for a Rule 11 sanction, the

Court shall impose sanctions on Plaintiffs' attorney, Andre S. Wooten, to pay half

of Defendants' reasonable attorneys' fees and other expenses as a direct result of

the costs incurred in defending this lawsuit, pursuant to Fed. R. Civ. P. 11(c)(1)(B)

and 11(c)(2).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 13, 2007.



_____
David Alan Ezra
United States District Judge

Glenn Mabson, et al. vs. Association of Apartment Owners of Maui Kamaole, et al., Civil No. 06-06-00235 DAE-LEK; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' EX PARTE MOTION FOR ENLARGEMENT OF TIME TO FILE OPPOSITION AS MOOT; AND ORDERING PLAINTIFFS' COUNSEL TO SUBMIT FURTHER ARGUMENT TO SHOW CAUSE AS TO WHY THE COURT SHOULD NOT IMPOSE A RULE 11 SANCTION TO PAY FOR HALF OF DEFENDANTS' REASONABLE ATTORNEYS' FEES